COURT OF APPEALS
DECISION
DATED AND FILED

January 20, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP216-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2012CF147

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

MASTELLA L. JACKSON,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: MARK J. McGINNIS, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Mastella Jackson appeals a judgment, entered upon a jury's verdict, convicting her of first-degree intentional homicide, as an act of

domestic abuse, contrary to WIS. STAT. §§ 940.01(1)(a) and 968.075(1)(a) (2017-18).[1] Jackson also appeals the order denying her postconviction motion for a new trial. Jackson argues the circuit court erred by denying her motion for a change of venue, thus depriving her of her due process right to an impartial jury. We reject Jackson's arguments and affirm the judgment and order.

## BACKGROUND

¶2      In February 2012, the State charged Jackson with misdemeanor bail jumping and first-degree intentional homicide, as an act of domestic abuse—both charges arising from the stabbing death of Jackson's ex-husband, Derrick Whitlow. The circuit court granted Jackson's pretrial motion to suppress her inculpatory statements to police, as well as the physical evidence obtained during a search of her home. Jackson's pretrial motion to change venue remained pending when the State appealed the suppression order. On appeal, it was undisputed that Jackson's statements were properly suppressed; however, this court reversed that portion of the circuit court's order suppressing the physical evidence obtained during the search of her home. *See **State v. Jackson***, 2015 WI App 49, ¶2, 363 Wis. 2d 554, 866 N.W.2d 768, *aff'd*, 2016 WI 56, 369 Wis. 2d 673, 882 N.W2d 422.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶3      The matter returned to the circuit court to proceed to trial on the homicide charge.[2] Jackson's pending motion to change venue was denied. Before the start of voir dire, on the first day of the November 2016 trial, defense counsel again moved for a change of venue based on recent publicity. Specifically, the headline in that morning's local newspaper read: "Murder Trial Opens Without Defendant's Confession." According to defense counsel, as of that morning, the same article had seven online comments and had been shared twenty-nine times on Facebook. Defense counsel also heard a story "along the same lines" on the radio that morning.

¶4      The circuit court decided to proceed with voir dire, opting to address the question of exposure to pretrial publicity and its potential impact through individual voir dire. The court also decided it would strike for cause any prospective juror who was exposed to that morning's publicity. During voir dire, the court struck for cause seven prospective jurors who said they had been exposed to pretrial publicity, including three who were exposed to that morning's publicity.[3] The voir dire process ultimately culminated in the selection of twenty-eight people from a pool of seventy-nine prospective jurors.

¶5      Jackson renewed her motion for a change of venue, arguing there was a risk jurors would be exposed to publicity about the case when they returned

_____

[2] With respect to the bail jumping charge, Jackson entered a no-contest plea, stipulating that if she was found guilty of the homicide charge, she would also be guilty of misdemeanor bail jumping, and if she was found not guilty of the homicide charge, the bail jumping charge would be dismissed. The court therefore withheld an adjudication of guilt on the bail jumping charge until the jury returned its verdict on the homicide charge.

[3] The court also struck for cause six other prospective jurors for reasons unrelated to pretrial publicity.

home during the trial. Jackson also asserted that those who denied exposure to pretrial publicity and remained on the panel were either too afraid to admit exposure or would recall exposure during the trial. The circuit court denied the motion and again asked the twenty-eight prospective jurors, by a show of hands, if they had "some contact or some information from any media account or any other information about this case at any time prior to walking in through the courtroom doors this morning," and there were "no hands."

¶6      Jackson and the State then each exercised their allotted seven peremptory strikes, leaving a final panel of fourteen jurors (with two alternates) for trial. The circuit court reminded the jurors to avoid the media and to not do any research about the case until deliberations were complete. The jury found Jackson guilty of the crime charged, and the court imposed a life sentence with eligibility for extended supervision after thirty-five years. The court also accepted Jackson's earlier plea and imposed a concurrent nine-month sentence for the misdemeanor bail jumping conviction. Jackson filed a postconviction motion for a new trial, claiming that prejudicial pretrial publicity necessitated a change of venue to preserve her right to an impartial jury. The court denied the motion after a hearing. This appeal follows.[4]

## DISCUSSION

¶7      A criminal defendant has a constitutional right to a fair trial by an impartial jury. *Murphy v. Florida*, 421 U.S. 794, 799 (1975). Prospective jurors are presumed to be impartial. *State v. Louis*, 156 Wis. 2d 470, 478, 457 N.W.2d

---

[4] Jackson raises no specific challenge to the denial of her initial motion for a change of venue.

4

484 (1990). Therefore, the defendant bears the burden of overcoming that presumption by proving bias on the part of a prospective juror. *Id.*; *Wainwright v. Witt*, 469 U.S. 412, 423 (1985).

¶8 A defendant who is concerned about potentially prejudicial pretrial publicity may seek a change of venue to another county, WIS. STAT. § 971.22(3); or selection of a jury from another county, WIS. STAT. § 971.225(2). Due process requires a change of venue "where adverse community prejudice will make a fair trial impossible." *McKissick v. State*, 49 Wis. 2d 537, 544, 182 N.W.2d 282 (1971). However, prospective jurors who have been exposed to pretrial publicity and even those who may have formed preliminary opinions as to guilt or innocence, may nonetheless serve on a jury if the circuit court concludes they are able to set aside that information and those opinions. *See Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961), *superseded by statute on other grounds*, *as stated by Moffat v. Gilmore*, 113 F.3d 698, 701 (7th Cir. 1997).

¶9 We review a circuit court's denial of a change of venue motion under the erroneous exercise of discretion standard. *State v. Albrecht*, 184 Wis. 2d 287, 306, 516 N.W.2d 776 (Ct. App. 1994). However, we "independently evaluate the circumstances 'to determine whether there was a reasonable likelihood of community prejudice prior to, and at the time of, trial and whether the procedures for drawing the jury evidenced any prejudice on the part of the prospective or empaneled jurors.'" *Id.* (citation omitted). In making our evaluation, we consider:

> (1) the inflammatory nature of the publicity; (2) the timing and specificity of the publicity; (3) the degree of care exercised, and the amount of difficulty encountered, in selecting the jury; (4) the extent to which the jurors were familiar with the publicity; (5) the defendant's utilization of peremptory and for cause challenges of jurors; (6) the

> State's participation in the adverse publicity; (7) the severity of the offense charged; and (8) the nature of the verdict returned.

*Id.*

¶10    With respect to the inflammatory nature of the publicity, we note that an "informed jury is not necessarily a prejudicial one," *Thomas v. State*, 53 Wis. 2d 483, 492, 192 N.W.2d 864 (1972), and therefore "objective, factual, non-editorial reporting is not prejudicial," *State v. Fonte*, 2005 WI 77, ¶32, 281 Wis. 2d 654, 698 N.W.2d 594, *opinion clarified on denial of reconsideration*, 2005 WI 145, ¶12, 286 Wis. 2d 77, 704 N.W.2d 912.   However, when news reports "editorialize, amount to 'rabble rousing' or attempt to influence public opinion against a defendant," the publicity is inflammatory and presents a danger of prejudice.  *See* *Briggs v. State*, 76 Wis. 2d 313, 327, 251 N.W.2d 12 (1977).

¶11    Jackson argues that media reports of her confession are inflammatory.  *See* *Skilling v. United States*, 561 U.S. 358, 382 (2010) (recognizing that a confession is the type of "blatantly prejudicial information … readers or viewers could not reasonably be expected to shut from sight").  Although the State acknowledges that the publicity was "not helpful" and was potentially prejudicial, the information provided was nevertheless truthful.  Further, as the State argues, Jackson failed to show that the challenged publicity amounted to rabble rousing or was intended to bias the public against her.

¶12    Turning to the timing and specificity of the publicity, the newspaper article and radio account on the eve and day of trial were as close in time as one could get, and the accounts focused on the absence of Jackson's confession.  The record shows, however, that most of the prospective jurors had not seen or heard

this publicity. Furthermore, jurors were individually questioned about the publicity in order to avoid tainting the jury.

¶13 That brings us to the third factor—the degree of care exercised and the amount of difficulty encountered in selecting the jury. Jackson intimates that because voir dire lasted almost an entire day, it must have been difficult, thus showing that the jury was prejudiced. We disagree. As our supreme court recognized, a thorough voir dire can "solve the problems" raised by pretrial publicity and "ensure[ ] an impartial jury." *Fonte*, 281 Wis. 2d 654, ¶¶36-37. Here, Jackson acknowledges the circuit court was careful when conducting voir dire. That the court took special care in ensuring an impartial jury weighs against a venue change.

¶14 Jackson nevertheless argues the circuit court erred by failing to strike a potential juror who actually brought the newspaper to court on the date voir dire was conducted and had admitted to reading part of the article. The record, however, does not support this claim. The potential juror never made it into the pool of twenty-eight jurors, and the court individually questioned the prospective juror to determine whether other prospective jurors could have seen her newspaper. As a result, we perceive no error in this regard.

¶15 As the circuit court recognized when denying Jackson's postconviction motion, it had been "careful to err on the side of caution in dismissing jurors for cause to avoid any risk of prejudice based on pretrial publicity." Only two of the final twelve jurors—Nos. 3955 and 4225—had been exposed to pretrial publicity, but those exposures occurred in the distant past. Juror No. 3955 said that her exposure could have been "years ago" and she recalled "nothing" about the case. Juror No. 4225 said that his exposure to

publicity occurred close to the time of the 2012 murder. Neither of these jurors said they had been exposed to the recent pretrial publicity, although Juror No. 3955 stated that she received the newspaper at her house that morning. That juror recounted that she went directly to the sports section to cut out "Wonder Word" and did not have time to look at any other section of the newspaper.

¶16    Jackson moved to strike Juror No. 3955 for cause, asserting there was nothing preventing the juror from looking at the newspaper when she returned home and there was a danger that any memory of earlier publicity could be jogged at trial. The circuit court denied the motion, concluding, based on its assessment of the juror, that she was a "top candidate" to follow the court's directive to avoid media exposure about the case. Further, a juror's limited exposure to publicity months or years before trial does not, without more, render the juror unfit to serve. *See **Fonte***, 281 Wis. 2d 654, ¶¶36-37 (change of venue not required although five of twelve jurors had been exposed to pretrial publicity).

¶17    With respect to the fourth factor—the extent to which the jurors were familiar with the publicity—as discussed above, two of the final twelve jurors had been exposed to pretrial publicity years earlier, but neither could recall much of anything about the case. None of the impaneled jurors recalled exposure to the recent publicity that formed the basis of the underlying venue change motion. Jackson nevertheless argues that even if the jurors were not exposed to pretrial publicity, "normal human curiosity" would lead them to look for publicity as the trial progressed. The circuit court, however, instructed the jurors to avoid the media and to not do any research about the case until deliberations were complete. We presume that jurors followed the court's instructions. *See **State v. Truax***, 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989).

¶18    For the two jurors that admitted distant exposure to pretrial publicity, Jackson contends they would likely recall more as the trial progressed. Citing cases from other jurisdictions, Jackson also asserts that jurors cannot assess their own bias accurately. These arguments are speculative, at best. Moreover, the circuit court acknowledged it did not make decisions on striking individual jurors for cause simply based on their self-assessments but, rather, on their answers in combination with their body language. Thus, the court assessed the ability of the jurors to remain fair and impartial based on all of the information before it, not just their assurances. As mentioned, Jackson also asserted that those who denied exposure to pretrial publicity and remained on the panel were either too afraid to admit exposure or would recall exposure during the trial. Again, that argument is not supported by the record and is pure speculation.

¶19    Regarding the fifth factor—the defendant's utilization of peremptory and for cause challenges of jurors—Jackson claims she did not have enough peremptory strikes to remove Juror No. 3955 after the circuit court denied her motion to remove that juror for cause. Her conclusory assertion lacks any legal reasoning or legal citation. We need not address undeveloped arguments. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). In any event, as noted above, the court properly denied the motion to strike that juror for cause. If Jackson nevertheless believed that juror to be biased, she has failed to explain why she could not have used one of her seven peremptory strikes to remove the juror.

¶20    The remaining three factors are undisputed. The State did not participate in creating the publicity; the offense of first-degree intentional homicide is the most serious in Wisconsin; and a guilty verdict was returned.

9

¶21    After considering all of the relevant factors under *Albrecht*, we conclude that the circuit court did not erroneously exercise its discretion by denying Jackson's motion for a change of venue.  We also conclude that Jackson failed to overcome the presumption that the jurors acted impartially.  *See Louis*, 156 Wis. 2d at 478.

*By the Court*.—Judgment and order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.